Vernon COWAN, Plaintiff-Appellant,

v.

Joe CORLEY, Sheriff of Montgomery County, Texas, et al., Defendants-Appellees.

No. 86–2803

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

April 13, 1987.

Phillip W. Swisher, Peter W. Murphy, Conroe, Tex., for plaintiff-appellant.

Wm. Richard Powell, D.C. Jim Dozier, Houston, Tex., for Corley, et al.

John Roberson, Gregory Jones, Mark A. Carrigan, Houston, Tex., for Montgomery County Wrecker.

Before POLITZ, WILLIAMS, and JONES, Circuit Judges.

POLITZ, Circuit Judge:

Granting the motion to dismiss filed by Joe Corley, Sheriff of Montgomery County, Texas and other "public" defendants, the district court dismissed the complaint of Vernon Cowan which alleged violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961, *et seq.*, and 42 U.S.C. § 1983. Concluding that Cowan's pleadings do present claims upon which relief could be granted, we reverse and remand for further proceedings.

*Background*

Utilizing vehicles registered in his wife's name, Cowan operated a wrecker service in Montgomery County, Texas, a county just north of Houston. According to the undisputed allegations in the pleadings, Montgomery County has a population of nearly 200,000, many of whom are employed in Houston, and is traversed by two major federal highways, Interstate Highway 45 and U.S. Highway 59. These highways carry substantial vehicular traffic, including trucks, buses, and automobiles in interstate travel. I–45 and U.S. 59 are the major north-south traffic arteries in East Texas.

In September 1983, Sheriff Corley met with various persons operating wreckers in Montgomery County and proposed the formation of a trade association. As a consequence, the Montgomery County Wrecker Association was formed. Immediately thereafter, Sheriff Corley issued a set of 31 Emergency Wrecker Requirements.[1] The

---

1. A copy of Sheriff Corley's letter detailing the requirements was incorporated into Cowan's

requirements mandate that only members of the newly-formed association would be permitted to tow vehicles from public property. An initiation fee of $4,000 and annual dues of $150[2] was established as were, *inter alia*, rules governing membership, insurance, grievances, and fee charges.

Cowan joined the association, paying the initiation fee and requisite dues. He was limited to three wreckers to be operated totally within a small area of Montgomery County. Other members, alleged to be favorites of Sheriff Corley, were not subjected to such restrictions. All wrecker assignments, including those made on an owner-preference basis were routed through the sheriff's office and the association's dispatcher. Cowan complained to Sheriff Corley that assignments were not being made on an even-handed basis. Because of this challenge, Cowan alleges that he was summarily expelled from the association without warning or hearing.

Following his expulsion Cowan filed suit alleging that: (1) the actions of the sheriff, county officials, and the association and its representatives constituted a combination in restraint of trade in violation of federal antitrust laws; (2) their actions, as a pattern of racketeering activity, constituted a violation of RICO; and (3) their actions deprived him of his constitutional rights, contrary to 42 U.S.C. § 1983.

As noted, certain defendants filed a motion to dismiss for failure to state a claim upon which relief could be granted, Fed.R. Civ.P. 12(b)(6), alternatively seeking summary judgment. In granting the motion to dismiss, the district court concluded that Cowan had not established a jurisdictional basis for the antitrust claims, had not shown a pattern of racketeering activity, and had not shown the deprivation of a right secured by the constitution.

## Analysis

### 1. The antitrust claims

Cowan's antitrust claims are based on sections 1 and 2 of the Sherman Act,[3] legislation adopted pursuant to the Commerce Clause. Conduct deemed violative of that Act must have a substantial connexity to interstate commerce. In dismissing the complaint the district court found such a nexus absent.

We are mindful that Cowan has the burden of establishing the court's jurisdiction to hear the antitrust claim. *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Aetna Cas. & Sur. Co. v. Hillman,* 796 F.2d 770 (5th Cir.1986). The pleadings suffice for this purpose. Cowan's complaint directly involves vehicular travel on two major federal highways in Montgomery County. The district court concluded that the providing of wrecker service to traffic on these traffic arteries did not bear a sufficient relationship to interstate commerce to implicate federal antitrust laws. We disagree.

In enacting the Sherman Act, Congress exercised the full panoply of power authorized by the Commerce Clause. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). And as the Supreme Court elucidated in *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. at 241, 100 S.Ct. at 508, *citing Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942):[4] "The broad au-

---

complaint and is attached to this opinion as "Appendix A." Although carrying an effective date of January 17, 1983, the record reflects the year is incorrect and should be 1984.

**2.** Although the letter contains no reference to monthly dues, Cowan alleges that monthly dues of $35 also were demanded.

**3.** 15 U.S.C. § 1 provides in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 2 makes it a felony to monopolize, or to attempt or conspire to monopolize, any part of interstate or international commerce.

**4.** As the Court noted in *McLain,* the broad *Wickard* standard has been consistently applied in antitrust cases. In the benchmark *Wickard* decision, the Court held that under the Commerce Clause the Congress could prohibit a farmer from growing a small quantity of wheat for consumption on his farm because of the spectre

thority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually *in* interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially *affect* interstate commerce." The *McLain* court applied the Sherman Act to a real estate brokerage operation, a quintessentially local activity, declaring that for the establishment of federal jurisdiction "there remains only the requirement that respondents' activities which allegedly have been infected by a price-fixing conspiracy be shown 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246, 100 S.Ct. at 511. Applying this expansive standard, and after surveying similar relevant cases,[5] we conclude that the Sherman Act is applicable to the scenario alleged by Cowan.

It cannot be gainsaid that travel to and through Texas involves interstate commerce. Actions directly related to the competitive pricing, marketing, and furnishing of towing services to the interstate vehicular movement of people and goods through Montgomery County, substantially affect interstate commerce. It is within the power of Congress to eradicate or dampen activities which pose a threat to the free flow of any aspect of interstate commerce, including that which might appear to be totally local in nature. *See, e.g., Heart of Atlanta Motel v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Cowan's complaint alleges a sufficient intrusion into the interstate marketplace to implicate the Sherman Act. The district court has jurisdiction to hear this claim and the pleadings advance a claim upon which relief could be granted.

that if many farmers did likewise the aggregate consequence would affect wheat in interstate commerce.

5. *See, e.g., United States v. Young Bros., Inc.*, 728 F.2d 682 (5th Cir.1984) (conspiracy to fix bids on state highway project affected interstate commerce; *quoting United States v. Women's Sportswear Mfg. Ass'n.*, 336 U.S. 460, 464, 69

## 2. *The RICO claims*

■ Cowan's complaint alleges that the manner in which the Montgomery County Wrecker Association was formed and operated, the initiation and periodic dues, the restrictions imposed on his business operation, the refusal of the defendants to consider his complaints, and his expulsion from the association without the semblance of due process, all constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962. Citing *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the district court found that Cowan had not alleged a pattern of racketeering activity, but rather relied on alleged violations of 18 U.S.C. §§ 1951 and 1952(b)(2). The trial court concluded that "two isolated acts of racketeering activity do not constitute a pattern."

"A pattern of racketeering activity is defined as at least *two* acts of racketeering activity, one of which occurred within ten years after the commission of a prior act of racketeering activity." *United States v. Carlock*, 806 F.2d 535, 542 (5th Cir.1986); 18 U.S.C. § 1961(5). As *Sedima* teaches, two acts of racketeering activity may constitute a RICO pattern, but such will not always be the case.

Indeed, in common parlance two of anything do not form a "pattern." As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91-617, p. 158 (1969)....

*Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14, 87 L.Ed.2d at 358 n. 14 (emphasis by Supreme Court).

S.Ct. 714, 716, 93 L.Ed. 805 (1949): "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."); *St. Bernard Gen. Hosp. v. Hosp. Serv. Ass'n.*, 712 F.2d 978 (5th Cir.1983), and *Shahawy v. Harrison*, 778 F.2d 636 (11th Cir.1985) (holding hospital and related organization subject to antitrust laws).

We read this language in *Sedima* to direct a narrower definition of pattern than had been sometimes employed.[6] Consistent therewith, the district court correctly concluded that two illegal acts will not constitute a RICO pattern in every instance. In the case at bar, however, Cowan's complaint contains not only allegations of the two specific alleged criminal acts, but a litany of other predicate acts involved in the formation, organization, and operation of the association, including the manner of the organization, the setting and use of dues, the allocation of wrecker business, his expulsion from the association, and the concomitant exclusion from all wrecker calls originating on public property, calls which purportedly are the source of most wrecker business. Assuming without deciding that some of these acts were criminal violations, the combination of these activities suffices to constitute a pattern within the intendment of RICO.

■ As with the antitrust claims, RICO must relate to interstate commerce. But the connexity required is minimal. *R.A. G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th Cir.1985). As reflected in our discussion of the antitrust claims, adequate interstate involvement was alleged.

### 3. *The § 1983 claim*

■ The district court concluded that Cowan had not alleged a cognizable claim under 42 U.S.C. § 1983, observing that Cowan had not asserted a liberty interest violation. Although the pleadings claim a property interest violation, the factual allegations upon which the categorization is based directly relate to both property and liberty interests. The essence of Cowan's complaint is that he has been denied the opportunity to pursue his livelihood. That is a constitutionally protected interest. As we held in *Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir.1983):

'It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [fourteenth] Amendment to secure.' *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915). *See also Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) ("Without doubt, ['liberty' in the fourteenth amendment] denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life...."); *Schware v. Board of Bar Examiners*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) ("A state cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.") (footnote omitted); *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959) ("[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment...."); *Board of Regents v. Roth*, 408 U.S. 564, 573–74, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) (respondent denied relief because "[t]he State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities.

---

6. In *Smoky Greenhaw Cotton Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 785 F.2d 1274, 1280–81 n. 7 (5th Cir.1986), we stated:

In *Sedima*, however, the Supreme Court appeared to challenge the lower courts to develop a more rigorous interpretation of "pattern." [473 U.S. at 496 n. 14, 499], 105 S.Ct. at 3285 n. 14, 3287, 87 L.Ed.2d at 358 n. 14, 361. Responding to or anticipating this challenge, a number of lower courts have rejected the earlier broad interpretations of pattern. *See, e.g., Northern Trust Bank/O'Hare, N.A. v.*

*Inryco, Inc.*, 615 F.Supp. 828, 831–33 (N.D.Ill. 1985) (pattern requires "continuity and relationship"; thus two fraudulent mailings in conjunction with a single kickback scheme do not constitute a pattern); *Rojas v. First Bank Nat'l Assoc.*, 613 F.Supp. 968, 971 n. 1 (E.D.N.Y.1985) ("There must be a showing of at least two acts of racketeering activity and the threat of continuing activity."); *Teleprompter of Erie, Inc. v. City of Erie*, 537 F.Supp. 6, 12–13 (W.D.Pa.1981) (pattern requires a series of incidents and schemes which are ongoing).

Had it done so, this, again, would be a different case."). This Circuit has also repeatedly acknowledged the principle that a person has a liberty interest in pursuing an occupation. *See, e.g., Ferrell v. Dallas Independent School District,* 392 F.2d 697, 707 (5th Cir.1968); *Shaw v. Hospital Authority,* 507 F.2d 625, 628 (5th Cir.1975); *Daly v. Sprague,* 675 F.2d 716, 727 (5th Cir.1982).

*See also Bacon v. Patera,* 772 F.2d 259 (6th Cir.1985), upholding a § 1983 claim against a police chief for allegedly harassing private security guards who did not seek commissions from him.

As our holding in *Phillips* makes clear, the right to engage in the occupation of one's preference is not absolute. Within the strictures of due process both property and liberty interests may be constrained. Ultimately, that may prove to be the situation in the matter now before us. On that we express no opinion. But dismissal at this stage on the basis of Fed.R.Civ.P. 12(b)(6) [7] was error.

REVERSED and REMANDED for further proceedings.

## APPENDIX "A"

### MONTGOMERY COUNTY SHERIFF'S DEPARTMENT
### EMERGENCY WRECKER REQUIREMENTS
Effective JANUARY 17, 1983

1. All wreckers utilized by the Montgomery County Sheriff's Department will be members of the Montgomery County Wrecker Association.

2. A grievance committee comprised of four (4) Association members with one representative from the Sheriff's Department will review *written* complaints from citizens and/or complaining agencies. *No exceptions.*

3. Upon written agreement by the Association and S.O. concerning a member's suspension the Sheriff's Department will refrain from using the suspended member's wrecker and member will be pulled from dispatch.

4. The Association will require liability insurance each member/owner in a sufficient amount to protect the consumer [sic].

5. A number identifying the wrecker as a member of the Association will be clearly displayed on each wrecker.

6. Each wrecker must be equipped with an emergency light, brooms, fire extinguishers and a minimum of ten (10) fuses at all times.

7. Any complaint concerning the demeanor of any member of the Sheriff's Department and his relationship with a wrecker owner/driver will be completed in written form and presented to the Patrol Commander by a representative of the Grievance Committee.

8. The name of the wrecker company, address, city if applicable, and phone number must be displayed on both exterior sides of the wrecker vehicle.

9. An approved secure storage area will be provided.

10. Each wrecker company must provide an office and local telephone number in Montgomery County.

11. All company owners will be held accountable for the actions of their drivers.

12. All vehicles picked up in Montgomery County will be stored within the county for a minimum of fifteen (15) days or until the owner releases the vehicle to be moved.

---

7. Defendants alternatively sought a summary judgment. The affidavits of Cowan, members of his family, and of his counsel reflect genuine issues of material fact which preclude summary judgment disposition.

13. *No* wrecker will run emergency traffic unless authorized by a police officer or dispatcher.

14. No wrecker will pick up any vehicle, abandoned, wrecked, or standing on *public* property without authorization of a law enforcement agency.

15. Routine towing and wrecker fees will be formulated by the Association and submitted to the Sheriff's Department prior to being placed into effect.

16. Members of the Association must be wrecker owners.

17. There will be no solicitation of any scene after the officer's arrival.

18. Wreckers must park at least 100 feet from the scene, except in emergencies or at the officer's discretion.

19. Each wrecker driver will have a chip with a designated number assigned by the Association.

20. Owner's requests will prevail providing the vehicle owner indicates his choice to the officer at the scene, and the designated wrecker is readily available, if the vehicle presents no immediate danger to normal traffic flow. If there is no owner's request the officer will use the chip system.

21. Radio 37.180 frequencies to be reserved for wreckers and all wrecker radio traffic to be handled by Association dispatch office.

22. Association to install and maintain directline to S.O. dispatcher to be utilized for all wrecker related business.

23. Police wrecker tickets will be completed and a case number furnished by the officer upon authorizing any vehicle to be towed for any purpose with an additional copy to be furnished Association dispatcher. Wrecker dispatch will maintain log of towed vehicles for convenience of the owner and S.O.

24. The officer will not influence or attempt to influence the decision of any person in choosing or selecting a wrecker or repair service.

25. All wrecker calls to be dispatched thru the Association dispatcher including owner's request, and Association furnishing and maintaining 24 hour dispatch service.

26. Association will assume availability of wrecker needed.

27. Members of storage facilities not qualifying for approved storage yard may contact [sic], in writing, with an approved owner.

28. Approximate charges pending complications:

| | |
|---|---|
| Tow | $50.00 |
| Dolley | 35.00 |
| Tire Change | 10.00 |
| Drive Shaft R. | 12.50 |
| Roll over | 15.00 |
| Storage | 5.50 |

29. New membership fee $4,000 with dues $150.00 year.

30. Members of the Association will comply with state laws in forwarding a registered letter on vehicles stored ten (10) days or more.

31. Abandoned vehicles auction will be held within 30 days from date of notification by Wrecker Association.

/s/ Joe Corley
Joe Corley, Sheriff
Montgomery County
Sheriff's Dept.